UNITED STATES of America

v.

CONSOLIDATED FOODS CORPORA-
TION and Chef Pierre, Inc.

Civ. A. No. 78–1241.

United States District Court,
E. D. Pennsylvania.

June 14, 1978.

Walter L. Devany, John J. Hughes, James A. Backstrom, Jr., Raymond D. Cauley, Jr., Norma B. Carter, R. J. Scott Griffith, Antitrust Div., Philadelphia, Pa., for plaintiff.

Louis C. Keiler, Earl E. Pollock, Gary Senner, and Sharon S. Feather, of Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Consolidated Foods.

James J. Rodgers and Benjamin M. Quigg, Morgan, Lewis & Bockius, Philadelphia, Pa., for Chef Pierre.

## OPINION

DITTER, District Judge.

In this civil anti-trust suit, the Justice Department sought to prevent the acquisition of Chef Pierre, Inc. by Consolidated Foods Corporation. The complaint charged a violation of the Clayton Act, section 7,[1] and that jurisdiction in this court is conferred by section 15.[2]

On May 10, 1978, after an eight day trial, I issued an order denying all injunctive relief. The order was accompanied by my findings of fact and conclusions of law, and it was followed by a lengthy opinion which explains the merits of this case.[3] Upon entry of my order, the Government made a motion for a new trial, which I denied from the bench. I will now set forth my reasons for that denial.

This litigation has had a brief but important history. On November 30, 1977, Consolidated Foods, a Maryland corporation with its principal place of business in Chicago, Illinois, and Chef Pierre, a Delaware corporation from Traverse City, Michigan, announced their plans to merge. This agreement was approved by the companies' boards of directors on January 30, 1978. Ratification by the Chef Pierre shareholders was required by April 30, 1978, since the

stantially from that contained in the instant record, upon which, of course, I base my conclusions.

1. 15 U.S.C. § 18.

2. 15 U.S.C. § 25.

3. This opinion was filed on May 31, 1978.

agreement would expire on that date if the merger had not been consummated. Accordingly, a shareholders' meeting was scheduled to be held in Traverse City on April 17, 1978.

The Department of Justice learned of the merger plan at the time of its announcement. Through its Philadelphia Anti-Trust Division, the department began an investigation by sending letters to the companies, as well as to many of their competitors, in order to ascertain what anticompetitive effect, if any, the proposed merger might have. The first of these letters was sent on December 7, 1977. Having gathered information by this method and through telephone calls, the Philadelphia office, on March 17, 1978, made its recommendation to the Department of Justice in Washington. Twenty-five days passed before a decision was made authorizing the bringing of suit. The next day, Thursday, April 13, 1978, the complaint that launched this litigation was filed. It charged that Consolidated's acquisition of Chef Pierre would substantially lessen competition and thereby violate section 7 of the Clayton Act. The Government sought a temporary restraining order and a preliminary injunction which would prohibit the defendants from taking any further steps toward consummating the merger. The complaint also requested that the defendants be permanently enjoined from carrying out the provisions of the merger agreement.

At a conference in my chambers the following day, Friday, April 14, 1978, counsel for the defendants informed the court that due to the suit, the shareholders' meeting scheduled for April 17 had been postponed until April 28, 1978. In an effort to conclude this matter before that time, the defendants asked that the court invoke the provisions of Rule 65(a)(2) of the Federal Rules of Civil Procedure whereby a hearing on a preliminary injunction is consolidated with a plenary trial on the merits resulting in a final judgment.[4] Noting that the Government had allowed four and one-half months to pass before bringing this action, mindful of the pre-complaint discovery powers available to the Government, and conscious of the obvious hardship that delay would visit on the defendants, I granted their request and told the attorneys that trial would begin as soon as the case then before me was concluded. I also suggested that every effort be made to stipulate to as many facts as possible. Counsel assured me they would do so.

The matter then on trial was completed the following Tuesday, April 18, and I met with counsel again to consider a motion filed by the Government to limit the hearing to matters pertaining to a preliminary injunction. I was told that a broad range of stipulations had been agreed upon, the issues had been narrowed tremendously, and that the Government's need to call 18 witnesses had been eliminated. Nevertheless, the Government said it needed more time because it had not as yet talked to all of its potential witnesses, one of whom was on vacation in Florida and another in Jamaica. The Government stated that this was a major anti-trust case involving a significant segment of the economy. It emphasized the interest of the public in these proceedings and submitted that the public had an important stake in the matter.[5]

Still feeling that fairness to the defendants required a prompt decision on the merits, I directed that the case proceed on a

---

4. Defense counsel expressed their belief that this trial would only take about three days, as they were willing to stipulate to much of what the government intended to prove by witnesses. Thus, it was not unrealistic to hope for a decision by April 28, 1978. The parties did, in fact, enter into extensive stipulations, thereby abbreviating the trial somewhat. Despite the obvious good-faith efforts of all counsel, however, the presentation of the Government's case took much more time than the defense

had anticipated and the trial did not end until April 28. With this court's assurance that the decision would be announced by May 10, 1978, the shareholders' meeting was again postponed until May 12, 1978. Apparently, the defendants modified their merger agreement to provide for this extension.

5. Congress has recognized the need to expedite anti-trust cases of general public importance. 15 U.S.C. § 28.

consolidated basis starting the next day. I also said to the Government,

. . . if you find out you will have a problem despite your best efforts to bring these people in or get them in since they are in Florida or Jamaica or wherever they may be, we will then consider an appropriate request at that time.

Later I added,

We will get started tomorrow on the basis of its being a consolidated hearing. If during the course of that hearing you bring to my attention the need for additional time and I am convinced that you need it, I will no doubt grant it to you . . . So we will get started tomorrow morning and if and when you find you can't stipulate as to matters and you find that people, wherever they may be, then come and tell me about it, say we have this fellow in Jamaica and we can't get anyone to Jamaica to bring him back, whatever.

In the same vein I said,

I am not precluding the government from asking for additional time. If and when you get to the point where you find that you can't stipulate any further and if and when at that point you just can't get your witnesses in, I [will] want to know who the witnesses are and what you are expecting them to testify to and what efforts you have made to get them in. And I [will] want to know the facts necessary to make a decision.

At no time did the Government ask for more time to produce a specific witness or exhibit. There was no suggestion that the defendants were unreasonably refusing to stipulate. Recesses, lunch breaks, and court hours were set to help ease whatever witness problem was brought to my attention. It is important to note that at no time prior to the trial, during the trial, or after the trial has the Government suggested any delay was attributable to the fact that either of the defendants had not supplied documents or information or entered into stipulations when requested to do so.[6] There was no suggestion that any company in the industry had withheld information or had failed to provide it promptly. In fact, the sole reason advanced for delay until the eve of Chef's shareholders' meeting was the meticulous care exercised by the Government in reviewing the information it received and in determining whether it should proceed with suit.

■ The Government's motion for a new trial is based on the proposition that it was fundamentally unfair to proceed so quickly to an immediate trial on the merits. Specifically, plaintiff asserts that it was prejudiced in four ways:

a) the Government did not learn what defenses would be raised until issue was joined on April 17, two days prior to the start of the trial;

b) no time was allowed for discovery;

c) there was insufficient time to secure the presence of some witnesses the Government wished to call; and

d) Government counsel were unable to interview some of their witnesses before the start of the trial.

Taken together, these claims of prejudice amount to an assertion that the Government was not given enough time to marshal its evidence and prepare its case. I find this to be a hollow protest.

At the outset, I note that any "fundamental unfairness" visited upon the Government by promptly proceeding to trial must be balanced against any "fundamental unfairness" which would have been visited on the defendants by delay. Almost

---

6. It might be argued that there were two exceptions to this statement. The Government had requested certain reports and information from Consolidated. The documents in question, approximately one file drawer in bulk, were made available in Chicago. It was not until after trial was underway that the Government raised with me Consolidated's failure to bring the documents in question to Philadelphia. Thereafter the documents were produced in Philadelphia. Secondly, the Government complained that it did not know what testimony would be given by the defendants' expert. A seven page summary of his expected testimony was then prepared and furnished to the Government on the fourth day of trial five days before the Government rested its case.

four and one-half months had passed from the announcement of the merger until the Government chose to file its complaint. I am not suggesting that there was a lack of diligence on the part of anyone, but the fact remains that suit was filed just four days before the scheduled meeting of Chef Pierre's stockholders and that by its terms, the merger agreement would expire 13 days thereafter.

█ A complaint seeking an injunction asks for an extraordinary remedy. By the very fact that it chose to proceed in this fashion, the Government implied it had sufficient facts and witnesses to show the probability of a lessening of competition and the reasonable probability of success on the merits. Nine Government lawyers signed the complaint which prayed for a temporary restraining order and preliminary injunction. Four Government lawyers signed the motion for preliminary injunction thereby certifying, according to F.R. Civ.P. No. 11, that to the best of their knowledge, information, and belief there was good ground to support the motion.[7] It was accompanied by a 24-page memorandum which showed not only a great familiarity with the leading cases, but also an intimate knowledge of the frozen pie industry. There was extensive quotation from *United States v. Mrs. Smith's Pie Co.*, 440 F.Supp. 220 (E.D.Pa.1976), and factual allegations concerning the industry and the sales of Consolidated and Chef Pierre.

The Justice Department lawyers who represented the Government here were no strangers to the pie industry. The same regional office of the Anti-Trust Division that conducted the investigation and trial of this matter had also prosecuted the Mrs. Smith's case.[8] There, Judge Newcomer of this district ordered Mrs. Smith's to divest itself of the Lloyd J. Harriss companies, which it had already acquired. Harriss, like Mrs. Smith's and Chef Pierre, is a major producer of both retail and institutional pies.

Many of the issues in the *Mrs. Smith's* case were the same as those presented in this litigation. Resolution of those issues in both cases depended upon an examination of precisely the same industry. Surely, in investigating this case, the Government must have found itself retracing many of the steps it had previously taken. Thus, even before this investigation began, the Government's counsel were already in a position to know just what information they would need and who many of their principal witnesses would be, as well as where that information and those witnesses would be found.[9] Indeed, Chef Pierre itself was a major source of data in the Mrs. Smith's–Lloyd J. Harriss merger investigation. In this climate of ready familiarity with the industry, the wheels of the precomplaint discovery process should have turned with unusual speed and efficiency.

█ Balancing the time and procedures available for discovery, the knowledge of the government's lawyers with the industry, the interests of the public and defendants, and my willingness to afford additional time to the Government if requested

---

7. As to a lawyer's responsibility when he signs a complaint, see *Miller v. Schweickart*, 413 F.Supp. 1059, 1061 (S.D.N.Y.1976).

8. Two of the Justice Department's trial counsel in this case, Mr. Devany and Ms. Carter, were listed as counsel of record in the *Mrs. Smith's* case. 440 F.Supp. at 221. I note also that I have received no explanation as to why the plaintiff decided to prosecute the instant action in this district. Consolidated Foods is incorporated in Maryland and has its principal place of business in Chicago, Illinois. Chef Pierre is a Delaware corporation with its principal offices in Traverse City, Michigan. This district, of course, is a proper venue since the defendants transact business here. 15 U.S.C. § 22. The same could probably be said, however, of most, if not all, the federal districts across the country. Absent any other explanation then, it is fair to assume that the Government's choice of venue was influenced by counsel's familiarity with the industry.

9. Surely, proof of the assertion that the Government knew who to call and where to look in making its case lies in the fact that despite its claimed lack of an opportunity to prepare, the Justice Department presented no less than twelve witnesses, together with a voluminous array of documentary exhibits at the trial of this matter.

with reasonable specificity to do so, I concluded the interests of justice would best be served by a consolidated hearing. If it was fundamentally unfair for trial on the merits to be ordered 133 days after the Government began discovery then it was fundamentally unfair for the Government to seek a preliminary injunction. By its clear terms, Rule 65(a)(2) permits the trial on the merits to be advanced and consolidated with that hearing. The Government has offered no authority to show that such a consolidation was improper in this case or in an anti-trust context generally.

I am aware of the decision by the Fifth Circuit in *Dillon v. Bay City Construction Co., Inc.,* 512 F.2d 801 (5th Cir. 1975). That case was both an individual and a class action under the civil rights laws which sought to enjoin a pattern of discrimination in the sale of houses. The plaintiffs filed their complaint on May 24, 1973. Six days later, the District Judge advised the parties of his intention to consolidate the trial on the merits with the hearing on the preliminary injunction, and he proceeded accordingly on June 9, 1973. The Court of Appeals reversed, principally on the ground that the parties had been denied a sufficient opportunity for discovery. 512 F.2d at 802.

The *Dillon* case is readily distinguishable from the matter before me. First, *both* parties to the *Dillon* litigation objected to the consolidated hearing because they were unprepared, especially as to the damages issue. Here, by contrast, I ordered consolidation on the defendants' motion, and only the plaintiff objected. Secondly, there was some confusion as to the intended procedure at the trial level in *Dillon.* After presenting two witnesses, "the [plaintiffs]

rested their case, thinking, according to their counsel, that evidence had been put on solely for the motion for preliminary injunction." 512 F.2d at 803. No such confusion existed or is asserted in this case.

Finally, and most importantly, the Court of Appeals rested its reversal upon the observation that the consolidated hearing "inhibited altogether the extensive discovery and investigation necessitated by this kind of class action and to which plaintiffs had a right under F.R.Civ.P. 26." 512 F.2d at 804. For several reasons, I conclude that at the time the trial in this action began, the Government's discovery needs were not, or should not have been, nearly so great as those of the class action plaintiffs before the Fifth Circuit in *Dillon.*

■ It is important to note the broad pre-complaint discovery rights that Congress has bestowed upon the Justice Department in anti-trust cases. Through the use of "civil investigative demands" (CID's), the Attorney General and his assistants can compel discovery from *any person* whom they reasonably believe to be in possession of information or documents relevant to a civil anti-trust investigation. The recipient of a CID can be required to produce his documents, answer written interrogatories, or give oral testimony concerning the information and material he possesses. Most significantly, this process is expressly intended to occur *prior* to the institution of the Government's lawsuit. 15 U.S.C. § 1312(a).[10] Moreover, it is not limited to persons that the Government might expect to join as defendants, should it decide to bring suit. On the contrary, a CID can properly be served on *anyone* thought to possess pertinent data.[11]

10. 15 U.S.C. § 1312(a) provides:

Whenever the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, has reason to believe that any person may be in possession, custody, or control of any documentary material, or may have any information, relevant to a civil antitrust investigation, he may, prior to the institution of a civil or criminal proceeding thereon, issue in writing, and cause to be served upon such

person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to answer in writing written interrogatories, to give oral testimony concerning documentary material or information, or to furnish any combination of such material, answers, or testimony.

11. Congress has also provided for enforcement of CID's. 15 U.S.C. § 1314. For a recent discussion involving this enforcement proce-

 

The Government has not made specific reference to any witness whose testimony it was forced to forego—nor to any document which it could not produce because of the consolidated hearing. There was no contention that the Government's strategy or tactics would have been changed. The only specific assertion came in post-trial argument when the Government claimed it did not even know at the time trial began who its witnesses would be but could have been prepared if afforded two additional weeks. No such statement was made pre-trial. There was no request for an additional two weeks and no statement that the Government did not know who it intended to call. I conclude therefore that the Justice Department could have and should have been prepared for trial on the merits if it requested a preliminary injunction—and that a balancing of the equities required prompt disposition on the merits. If the Government suffered any prejudice, the specifics of which are still unknown to me, it was plainly self-inflicted.

Delay in the administration of justice has been the subject of much criticism.[12] President Carter is "worried" about it. The New York Times, May 5, 1978, at A 1, col. 5. Chief Justice Burger has cited the lengthy duration of trials as a major problem in the federal courts. 46 U.S.L.W. 2615. (Opening Remarks before the 55th Annual Meeting of the American Law Institute, May 16, 1978). Anti-trust litigation in particular has been singled-out as a notorious repository of delay, and it has been noted that the blame lies as much with the Government as with the defendants. The Wall Street Journal, May 10, 1978, at 24, col. 1.

Of course, many anti-trust cases will not lend themselves to a speedy disposition, and in those instances, the Government must be given ample time in which to prepare. This, however, was not such a case. As explained above, proper use of CID's here could have vastly reduced the need for the protracted discovery process which is often the debilitating hallmark of anti-trust litigation. Where this is possible, it is not unreasonable to require it.

It was for these reasons that the motion for a new trial was denied.

---

dure, see *United States v. GAF Corp.*, 449 F.Supp. 351 (S.D.N.Y.1978).

**12.** King John promised in the Magna Carta, 1215, "to none will we . . . deny, to none delay, either right or justice." In 1601, William Shakespeare lamented the law's delay. Hamlet, Act II, Scene 1. There have been more recent criticisms too numerous to mention.